# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTION ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**
LEO J. DUTIL, on behalf of himself and all others similarly situated

**DEFENDANTS**
R. MICHAEL ROULEAU, BRYAN M. DECORDOVA, DUANE E. HIEMENZ, RICHARD C. MARCUS, THOMAS C. DECARO, JAMES F. TUCKER, EDWARD F. SADLER and ROBERT M. SPENCER and MICHAELS STORES, INC. (see attached)

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF – WASHINGTON CO., VT
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT - Dallas County, TX
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
William B. Federman
FEDERMAN & SHERWOOD
120 N. ROBINSON, SUITE 2720
OKLAHOMA CITY, OK 73102
(405) 235-1560/Fax (405) 239-2112
AND
2926 MAPLE AVENUE, SUITE 200
DALLAS, TX 74201

ATTORNEYS (IF KNOWN)

**3-03CV2061-R**

RECEIVED
SEP 11 2003
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| II. BASIS OF JURISDICTION | (PLACE AN "X" IN ONE BOX ONLY) |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 640 R R & Truck | | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 650 Airline Regs | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 350 Motor Vehicle | ☐ 660 Occupational Safety/Health | **PROPERTY RIGHTS** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 690 Other | ☐ 820 Copyrights | ☐ 850 Securities/Commodities/Exchange |
| ☒ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | | ☐ 830 Patent | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | **PERSONAL INJURY** | ☐ 370 Other Fraud | | ☐ 892 Economic Stabilization Act |
| | ☐ 362 Personal Injury-Med Malpractice | ☐ 371 Truth in Lending | **LABOR** | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** | **SOCIAL SECURITY** | ☐ 740 Railway Labor Act | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 441 Voting | ☐ 861 HIA (1395ff) | ☐ 790 Other Labor Litigation | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | ☐ 862 Black Lung (923) | ☐ 791 Empl Ret Inc Security Act | |
| ☐ 290 All Other Real Property | ☐ 443 Housing/ Accommodations | ☐ 863 DIWC/DIWW (405(g)) | | |
| | ☐ 444 Welfare | ☐ 864 SSID Title XVI | **FEDERAL TAX SUITS** | |
| | ☐ 440 Other Civil Rights | ☐ 865 RSI (405(g)) | ☐ 870 Taxes (U S Plaintiff or Defendant) | |
| | **PRISONER PETITIONS** | | ☐ 871 IRS - Third Party 26 USC 7609 | |
| | ☐ 510 Motions to Vacate Sentence | | | |
| | **HABEAS CORPUS:** | | | |
| | ☐ 530 General | | | |
| | ☐ 535 Death Penalty | | | |
| | ☐ 540 Mandamus & Other | | | |
| | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

SECURITIES CLASS ACTION ALLEGING VIOLATIONS OF SECTIONS 10(B) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10b-5

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ YES ☐ NO |
|---|---|---|---|

**VIII. RELATED CASE(S)** (See instructions):
IF ANY
JUDGE Barbara M.G. Lynn   DOCKET NUMBER - 3:03-CV-0246-M

DATE
SEPTEMBER 10, 2003

SIGNATURE OF ATTORNEY OF RECORD
William b. Federman

**FOR OFFICE USE ONLY**
RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Attachement to Civil Cover Sheet

Dutil v. Michaels Stores, Inc. et. al.

Additional Defendants:

Charles J. Wyly;

Sam Wyly;

Richard E. Hanlon; and

Liz Minyard.

The JS - 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a) Plaintiffs - Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.   Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here. United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS - 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.   Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section V below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.   Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.   Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS - 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.



ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



NORTHERN DISTRICT OF TEXAS
**FILED**

SEP 1 1 2003

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| LEO J. DUTIL, Derivatively and on Behalf of Nominal Defendant MICHAELS STORES, INC., | § § § | Civil Action No. |
| Plaintiff, | § § | **3 - 0 3 C V 2 0 6 1 - R** |
| vs. | § § | |
| R. MICHAEL ROULEAU, BRYAN M. DeCORDOVA, DUANE E. HIEMENZ, RICHARD C. MARCUS, THOMAS C. DeCARO, JAMES F. TUCKER, EDWARD F. SADLER, CHARLES J. WYLY, SAM WYLY, RICHARD E. HANLON, LIZ MINYARD and ROBERT M. SPENCER, | § § § § § § § § § | |
| Defendants. | § § | DEMAND FOR JURY TRIAL |
| MICHAELS STORES, INC., | § § | |
| Nominal Defendant. | § § | |

## COMPLAINT

Plaintiff, Leo J. Dutil, by and through his attorney, submits this Derivative Complaint against the defendants named herein.

### INTRODUCTION AND SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant, Michaels Stores, Inc. ("Michaels Stores", "Michaels" or the "Company") against defendants, R. Michael Rouleau ("Rouleau"), Brian M. DeCordova ("DeCordova"), Duane E. Hiemenz ("Hiemenz"), Richard D. Marcus ("Marcus"), Thomas C. DeCaro, ("DeCaro"), James F. Tucker ("Tucker"), Edward F. Sadler ("Sadler"), Robert M. Spencer ("Spencer"), Charles J. Wyly ("Charles Wyly"), Sam Wyly ("Sam Wyly"), Richard E. Hanlon ("Hanlon"), and Liz Minyard ("Minyard") for their breaches of fiduciary duties through intentional misconduct, abdication of their duties of oversight of the company and/or gross mismanagement during the period from August 8, 2002, through November 7, 2002 (the "Relevant Period").

2.      Michaels is a national specialty retailer which provides craft ideas and supplies for hobbyists. As of March 2002, the Company owned and operated 708 Michaels retail stores in the continental U.S. and Canada, which stores sell do-it-yourself home decorator products and arts and crafts supplies.  Throughout the Relevant Period, the Company also owned and operated approximately 142 Aaron Brothers stores, primarily on the West Coast, which stores offer photo frames, custom framing services and a wide selection of art supplies. In addition, the Company also owns and operates Star Wholesale, a single-store wholesale operation located in Dallas, Texas, offering merchandise primarily to interior decorators/designers, wedding/event planners, florists, hotels, restaurants and commercial display companies.

3.      As alleged herein, during the Relevant Period, certain of the Defendants repeatedly represented that Michaels Stores' financial condition was strong and that the Company was increasing its market share and would continue to do so in the foreseeable future.  The Company was persistent in its claims despite a known downturn in the consumer-goods markets and a very, very difficult earnings environment.  In fact, throughout the Relevant Period, defendants consistently appeared at analyst conferences and in other public forums and made very positive statements about Michaels Stores that conditioned investors to believe that: (i) as a result of Michaels Stores' unique combination of assets and market condition, the Company was poised to continue growth and acceleration of market share, despite, or rather as a result of, very difficult market conditions; (ii) despite market conditions that were resulting in downward revisions at Michaels Stores' competitors, the Company was not in danger of failing to meet Company-sponsored expectations for revenue growth; and (iii) the Company's phenomenal second quarter 2002 results were caused by Michaels Stores' strong operating performance.

4.      Thus, rather than admit, throughout the Relevant Period, that Michaels Stores was *already* experiencing a severe downturn in its store profits and earnings per share, and was also

being adversely affected by the same market conditions which were hurting virtually all of the

Company's competitors, the Company stated:

- Michaels Stores had established itself as *a specialty retailer that dominated its category* (arts and crafts).

- *A multi-year investment program in sophisticated distribution and information systems was beginning to pay off in a big way,* as evidenced by the huge upside earnings surprises reported in recent quarters.

- Michaels Stores *was able to overcome adverse market conditions due to its unique attributes and market abilities and,* as a result, the Company's earnings power far exceeded its then current levels.

- Although shares of Michaels Stores stock were increasing in price throughout the Relevant Period, trading near their 52-week high, shares of the Company *remained conservatively valued,* and represented a growth investment for shareholders.

- The Company was exceeding guidance sponsored by defendants and Michaels Stores shares were likely to outperform the market as a result of defendants' unique management abilities, the increase in productivity resulting from recent systems and infrastructure upgrades and the Company's strong earnings momentum.

5.     What investors could not, and did not, know at the time the Company announced

second quarter 2002 results - *which purported to show a stellar 359% increase in net income*

*and a 329% increase in earnings per share* - was that defendants had been able to achieve these

phenomenal results only by fully utilizing a $14.8 million "markdown reserve" previously recorded in the

fourth quarter 2001 "to offset the liquidation of certain merchandise that did not conform to each

store's specific plan-o-gram SKU program." The Company had realized a $14.8 million markdown

reserve, without saying a thing about it when announcing the Company's financial results for the

second quarter 2002 on or about August 28, 2002. In fact, defendants did not disclose that the $14.8

million reserve was reversed to offset the liquidation of merchandise until the Company filed its Form

10-Q with the SEC on or about September 17, 2002. Taking advantage of this misleading

omission, ***certain defendants made over $15.3 million worth of insider sales of Michaels' shares***

***from their personal holdings*** while in possession of material adverse non-public information.

6.      In addition to concealing that it was the reversal of large markdown reserves that

padded the Company's second quarter fiscal 2002 results, defendants also concealed that the

Company was suffering from a host of undisclosed adverse factors which were negatively impacting its

business and ensuring that Michaels Stores would report declining earnings and revenues during

the next quarter. Thus it was only on November 7, 2002, when the Company released results for its

third quarter 2002, that investors learned the following:

- The Company's claims that Michaels Stores' purported "record setting" growth was the result of systems and/or infrastructure upgrades, or any other improvements made by defendants, were false, as the Company was then witnessing declining prospects, and the Company had achieved this "record setting" performance only by engaging in illicit accounting manipulations and gimmicks to artificially inflate margins, net income and earnings.

- Many of Michaels Stores' customers were already curtailing their spending for hobby and entertainment - or discretionary purchases - by the inception of the Relevant Period and, as a result, Michaels Stores was experiencing the same adverse market conditions which were negatively impacting the Company's competitors, and, as such, defendants did not possess any proprietary formula or business model that would allow the Company to achieve results which outpaced or outperformed the market.

- The Company was not "in great shape," it did not have "considerable momentum" and was not proceeding according to guidance sponsored or provided by defendants.

- The clandestine reserve accrual in the second quarter 2002 had the effect of artificially inflating the gross margins of goods during the second quarter (since the margin on the incremental piece of inventory which was liquidated to offset the reserve effectively had a zero cost basis) and therefore added 100% to Michaels Stores' reported margin improvement.

- Notwithstanding defendants' efforts to create the materially false impression that the Company had achieved record results in the fiscal second quarter, the truth was that Michaels Stores was already suffering from the same adverse market conditions other retailers were experiencing.

- 4 -

7.     In all, during the Relevant Period, at the time that Michaels Stores was being adversely affected by the aforementioned factors, but prior to any disclosure to the market, certain of the defendants sold more than $15.3 million worth of their personally held Michaels Stores common stock to the unsuspecting public, while in possession of material adverse information.  In fact, the CEO and President of the Company, defendant Rouleau, himself sold over 125,000 shares of his privately held Company shares during the Relevant Period to reap over $5.8 million in illegal profits.  Certain other senior officers and/or directors *sold 100% of their Michaels Stores holdings during this short period of time* - the very time in which the Company was regularly appearing at analysts' and investor conferences and relentlessly issuing press releases telling investors that Michaels Stores was not being adversely affected by current market conditions which were already negatively affecting Michaels Stores' competitors.

## JURISDICTION AND VENUE

8.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1). Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

9.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this District because nominal defendant Michaels' principal place of business is within this district and a substantial portion of the transactions and wrongs complained of herein transpired within this district.

## PARTIES

11.     Plaintiff, Leo J. Dutil is, and was at all relevant times, a shareholder of nominal defendant.  Plaintiff is a citizen and resident of Vermont.

- 5 -

12.    Defendant Michaels Stores is a Delaware corporation with its principal place of business at 8000 Bent Branch Drive, Irving, Texas 75063. Michaels Stores is a national specialty retailer which provides craft, art supplies and materials through approximately 850 company owned and operated Michaels Stores (708 stores at March 2002) and Aaron Brothers stores (142 stores at March 2002) located primarily on the West Coast. Defendant Michaels Stores may be served with process by serving its registered agent for service of process, CT Corp., at 350 N. St. Paul Street, Dallas, Texas 75201.

13.    Defendant Rouleau is, and at all times relevant to the allegations raised herein was, President and CEO of Michaels Stores. During the Relevant Period, while in possession of material adverse, non-public information, defendant Rouleau sold over 125,000 shares of his privately held Michaels Stores stock to reap over *$5.83 million* in gross proceeds. Defendant Rouleau is a citizen and resident of Texas. Defendant Rouleau may be served with process at Michaels Stores, Inc., 8000 Bent Branch Drive, Irving, Texas 75063.

14.    Defendant DeCordova was, until his sudden retirement from the Company, at all times relevant to the allegations raised herein, Chief Financial Officer of Michaels Stores. Defendant DeCordova is a citizen and resident of Texas. He may be served with process at 319 Martel Lane, Coppell, Texas 75019.

15.    Defendant Hiemenz was the Sr. Vice President of the Company during the Relevant Period. Hiemenz is a citizen and resident of Texas.

16.    Defendant Marcus was a Director of the Company during the Relevant Period. Defendant Marcus is a citizen and resident of Texas.

17.    Defendant DeCaro was Sr. Vice President – Inventory Management of the Company during the relevant period. DeCaro is a citizen and resident of Texas.

- 6 -

I.\MichaelStores\Dutil\Complaint.doc

18.    Defendant Tucker was Executive Vice President – Chief Information Officer of the Company during the relevant period.  Defendant Tucker is a citizen and resident of Texas.

19.    Defendant Sadler was Executive Vice President – Store Operations during the Relevant Period.  Defendant Sadler is a citizen and resident of Texas.

20.    Defendant Spencer was Executive Vice President – General Merchandise Manager during the Relevant Period.  Defendant Spencer is a citizen and resident of Texas.

21.    Defendant Charles Wyly was Chairman of the Board of Directors of the Company during the Relevant Period.  Defendant Charles Wyly is a citizen and resident of Texas.

22.    Defendant Sam Wyly was Vice Chairman of the Board of Directors of the Company during the Relevant Period.  Defendant Sam Wyly is a citizen and resident of Texas.

23.    Defendant Hanlon was a member of the Board of Directors during the Relevant Period.  Defendant Hanlon is a citizen and resident of Texas.

24.    Defendant Minyard was a Director of the Company during the Relevant Period.  Defendant Minyard is a citizen and resident of Texas.

25.    The defendants listed below (collectively with Rouleau, the "Selling Defendants") are senior officers and/or directors of the Company who sold stock during  the Relevant Period while in possession of material non-public adverse information concerning the Company in the amounts indicated below:

| Name | Position | No. Shares Sold | Gross Proceeds | % of Stock Holdings Sold |
|---|---|---|---|---|
| Duane E. Hiemenz | Officer | 61,668 | $ 2,848,444 | 90.7% |
| Richard C. Marcus | Director | 50,000 | $ 2,136,018 | 41.67% |
| Thomas C. DeCaro | Officer | 34,999 | $ 1,582,305 | 100.00% |

| | | | | |
|---|---|---|---|---|
| James F. Tucker | Exec. V.P. | 33,333 | $ 1,517,985 | 63.61% |
| Edward F. Sadler | Exec. V.P. | 20,000 | $   920,634 | 25.26% |
| Robert M. Spencer | Exec. V.P. | 10,166 | $   480,889 | 100.00% |
| **TOTAL** | | **210,166** | **$ 9,486,275** | |
| **Total Including Rouleau** | | **335,166** | **$15,319,716** | |

Defendants Hiemenz, Marcus, DeCaro, Tucker, Sadler and Spencer may be served with process at Michaels Stores, Inc., 8000 Bent Branch Drive, Irving, Texas 75063.

26.     It is appropriate to treat the defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers and/or directors of Michaels Stores, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

27.     Because of the defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual

- 8 -

operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

28.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the 'NYSE"), and governed by the provisions of the federal securities laws, the defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

29.     The defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Michaels Stores, each of the defendants had access to the adverse undisclosed information about Michaels Stores' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Michaels Stores and its business issued or adopted by the Company materially false and misleading.

30.    The defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. Each defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

31.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Michaels Stores common stock by disseminating materially false and misleading statements and/or concealing material adverse facts or is liable for recklessly permitting the perpetuation of such scheme. The scheme: (i) deceived the investing public regarding Michaels Stores' business, operations, management and the intrinsic value of Michaels Stores common stock; (ii) enabled the Selling Defendants to sell more than $15.3 million worth of their personally held Michaels Stores common stock while in possession of material non-public adverse information to the unsuspecting public; and (iii) caused investors to purchase Michaels Stores common stock at artificially inflated prices; (iv) resulted in numerous securities class action lawsuits being filed against the Company thereby exposing the Company to millions of dollars in liability to investors and causing the Company to incur current and future investigatory and legal expenses in the millions of dollars.

**DEFENDANTS' SCHEME AND
WRONGFUL COURSE OF BUSINESS**

32.    On August 8, 2002, the Company issued a release announcing that July sales had surged a purported 20% and, as a result of the Company's continued financial success, Michaels Stores was increasing its second quarter estimates, as follows:

> Michaels Stores, Inc. July Sales Surge 20% - Same-Store Sales Up 11 % - *Company Raises 2nd Quarter Earnings Estimates.*
>
> ... Michaels Stores, Inc. today reported that total sales for the month of July increased 20% to $191.4 million from $159.4 million for the same period last year. *Same-store sales for the month increased 11 % three percentage points higher than previously forecast. Total sales for the second quarter increased 19%* to $576.7 from $486.1 for the same period last year....
>
> [Defendant] Rouleau ... said, *"We are very pleased with our continuing performance. The investments we have made in our systems and infrastructure are really starting to pay off, and we're in great shape as we enter the fall and holiday seasons. We remain very optimistic and we have considerable momentum as we head into the third quarter. "*
>
> *On the strength of these higher sales, the Company has raised its earnings estimates per diluted share by $.02 to $.18 for the second quarter and $1.94 for the full fiscal year.* This increase comes on the heels of a $.05 increase in earnings guidance made last month. The Company also repurchased 392,000 shares of its Common Stock during the past month.

(emphasis added). In addition to the foregoing, defendants also used this release to condition investors to believe that the Company was in compliance with all of its reporting obligations and that its financial statements conformed with Generally Accepted Accounting Principles ("GAAP") and that its guidance was reasonable, as follows:

> Pursuant to a recent directive of the Securities and Exchange Commission relating to public companies with annual revenues greater than $1.2 billion, senior officers of the Company will be required to file written statements, under oath, regarding the accuracy of the Company's financial statements and their consultation with the Company's Audit Committee. In light of the Company's fiscal calendar, the Company is required to and will file such statements with the Commission by the close of business on September 17, 2002.

- 11 -

I:\MichaelStores\Dutil\Complaint.doc

33.     After the publication of the Company's market-reassuring August 8, 2002 release, the price of Michaels Stores common stock surged from a close of $34.10 per share on August 7, 2002, to a high of $37.50 per share on August 8, 2002, and within five trading sessions shares of Michaels Stores stock traded at over $41.50 in reaction to this extremely favorable news.

34.     Based on defendants' false public statements as well as information provided in one-on-one follow-up conversations, following the release of the Company's results on August 8, 2002, and the share price rally that followed, analysts issued "Buy" and "Strong Buy" ratings on shares of Michaels Stores stock, as follows:

| Brokerage | Rating | Target | Date | Comments |
|---|---|---|---|---|
| Commerce Capital | Strong Buy | $48 | 8/08/02 | Traffic & Average Ticket Gains Drive Comps |
| SWS Securities | Strong Buy | $50 | 8/08/02 | SWS Reiterates Strong Buy Rating |
| Suntrust | BUY | $51 | 8/08/02 | Raising Estimates after Robust July |
| Wedbush Morgan | BUY | $47 | 8/08/02 | Michaels Stores Reported Impressive July |

35.     On August 28, 2062, Michaels Stores issued a release which purported to announce a record setting second quarter 2002, with "record" second quarter earnings; net income soared an amazing 359%.; EPS climbed a remarkable 329%; purported earnings were $0.11 per share *above* consensus estimates. In addition, this release stated, in part, the following:

> Michaels Stores, Inc, today reported *record financial results for its second quarter* and the six months ended August 3, 2002. Net income for the quarter was $21.5 million, *a 359% increase compared to net income* of $4.7 million in the same period last year. *Earnings per share were $.30, 329%* or $.23 higher than last year's $.07 and $.11 higher than analysts' consensus.

- 12 -

Net income for the six months ended August 3, 2002 was $42.1 million, *a 252% increase* compared to net income of $12.0 million last year. Earnings per share were $.60, an increase of 233% over last year's $.18 per share.

Total sales for the second quarter increased 19% to $576.6 million from $486.1 million for the same period last year. Year-to-date sales of $1.180 billion increased 17% from $1.011 billion for the same period last year. Same-store sales were up 9% for the quarter and 7% year-to-date.

\* \* \*

[Defendant] Rouleau ... said, *"We are very, very pleased with our second quarter record sales and profit performance. We continue to build upon the momentum that we have generated over the last five years.* And, as we have consistently stated in the past, while *we are very pleased with our current financial performance, the real sales and profit benefits of the significant investments we have made in our infrastructure are still ahead of us and give us great confidence in our future."*

(emphasis added). Defendants also used this release to condition investors to believe that the Company was on track to meet third quarter guidance and that August sales were "much stronger than expected." In addition to the foregoing, the release stated:

The Company also reported that *August sales are coming in much stronger than expected*, and it is now projecting a same-store sales increase of 5% to 6% for the month, up from their prior guidance for flat same-store sales.

36.     The statements contained in the Company's August 8, 2002 and August 28, 2002 releases referred to above in ¶¶32 and 35 were each materially false and misleading when made. Each statement misrepresented and/or omitted to disclose the following adverse facts and conditions which defendants knew existed at that tune, or recklessly disregarded, the disclosure of which was necessary to make such statements not false and/or misleading, including that:

(a)     Defendants' claims that Michaels Stores' purported "record setting" growth was the result of systems and/or infrastructure upgrades, or any other improvements made by defendants, were false. Throughout the Relevant Period the Company was witnessing declining

- 13 -

I:\MichaelStores\Dutil\Complaint.doc

prospects. Defendants had achieved "record setting" results only by engaging in illicit accounting mechanizations and gimmicks to artificially inflate margins, net income and earnings;

(b)     Many of Michaels Stores' customers were already curtailing their spending for hobby and entertainment - or discretionary purchases - by the inception of the Relevant Period. As a result, Michaels Stores was experiencing the same adverse market conditions which were negatively impacting the Company's competitors. Contrary to defendants' representations, they did not have any formula or business model that would allow the Company to achieve results which outpaced or outperformed the market;

(c)     The clandestine reserve reversal in second quarter 2002 had the effect of artificially inflating the gross margins of goods during the second quarter (since the margin on the incremental piece of inventory which was liquidated to offset the reserve effectively had a zero cost basis) and therefore added 100% to Michaels Stores' reported margin improvement;

(d)     Notwithstanding defendants' efforts to create the materially false impression that Michaels Stores had achieved record results in the fiscal second quarter, the truth was that the Company was *already* suffering from the same adverse market conditions other retailers were experiencing;

(e)     By the inception of the Relevant Period, Michaels Stores was not performing according to guidance sponsored by defendants, and it was not reasonably foreseeable that the Company would achieve forecasted earnings or income estimates going forward. Defendants lacked a reasonable basis at the time upon which to ground such guidance or estimates; and

(f)     By the inception of the Relevant Period, it was wholly false for defendants to claim that they were "pleased with [their] current financial performance," knowing that the second quarter 2002 financial results were a hoax. At that time, defendants knew they did not have "great

- 14 -

confidence in [the] future," and that the Company did not have continued "momentum." In addition, Michaels Stores was not proceeding according to Company-sponsored guidance, and there was no reasonable basis upon which defendants could feign optimism about the Company's future financial performance.

37.    The materially false and misleading statements issued by the defendants in the quarterly earnings announcement had their intended effect. Again shares of Michaels Stores rallied, trading up over $5 per share, to close trading on August 29, 2002 at $45.21 per share.

38.    Also following the publication of the Company's August 8, 2002 and August 28, 2002 releases, analysts issued very positive recommendations on Michaels Stores. Issuing "Strong Buy" opinions and near-term price targets as high as $61 per share, these analysts recommended that their customers purchase shares of Michaels Stores, as follows:

- SWS Securities (Aug. 8, 2002; O. Tangun) STRONG BUY, Price Target of $50.00

    The Company reported an 11 % same store sales increase in July, better than our estimate of a[n] 8% increase. Total sales were $191.4 million, up 20% from the same period a year ago, Management raised 2Q 02 EPS guidance to $0.18 from $0.16. This comes after management increased EPS guidance $0.05 last month. *We will review our FY02 estimate and believe there is upside to our numbers. We are reiterating our Strong Buy rating and maintaining our 12-month price target of $50 based on 22x our FY03 EPS of $2.26.*

- CS First Boston (Aug. 13, 2002; G. Balter): BUY, Price Target of $50.00

*Sales Continue To Buck The Trend*
                                        * * *

    MIKs July comps (up 11 %) showed uncommon strength against a backdrop of high-profile misses and a larger retail spending slowdown in the second half of July.

    *We are raising our EPS estimates to reflect the strong sales and increased company guidance.*

                                * * *

- 15 -

Michael's dominant position in the craft and hobby category positions it attractively in a potential consumer slowdown; as we have said, MIK's sales do not show a strong correlation with the housing market, and we believe the current sales strength in the category which WMT highlighted once again in its weekly sales report for the first week of August is indicative of its resistance to larger fluctuations in more impulse-driven spending.

- Commerce Capital Markets (Aug. 29, 2002; R. Zimmerman): STRONG BUY, Price Target of $50

**Michaels Stores Results Far Exceed Q2 Expectations**
**Q3 Tracking Above Plan**

\* \* \*

*We remain confident in management's ability to execute, as well as continued consumer interest in arts and crafts.* We maintain our Strong Buy and are raising our 12-month target price from $48 to $50 per share.

- Wedbush Morgan Securities (Aug. 29, 2002; J. Bogucki-Storms): BUY, Price Target of $61

*Michaels Stores reported stellar Q2 EPS of $0.30, beating our estimate and consensus by an impressive $0.11; increasing our estimates and price target; Reiterating our BUY rating.*

\* \* \*

We believe that the current strong sales momentum and operational execution is likely to continue into 2H, although we are forecasting comps to moderate from recent levels as they face tougher comparisons. However, we expect MIK at least to meet our recently upward revised estimates. *We believe that the company has good operating margin expansion potential for the longer term, as it continues to benefit from systems investments and better merchandising as well as favorable demographics.*

- C.L. King & Associates (Aug. 29, 2002; W. Armstrong): STRONG BUY; Target Price of $54.00.

*Q2 Results Blow Away Expectations; Raising Estimate.*

\* \* \*

Q2 gross margins expanded by 329 basis points to 36.1% of sales. Better merchandise margins driven by more full-priced sales contributed approximately 200

- 16 -

basis points, while occupancy expense leverage and lower store closing costs account for the rest. We had been projecting only a 40-basis point improvement, so this was a startling increase and the single biggest source of the upside earnings surprise.

\* \* \*

MIK is one of the very few retailers to actually beat its sales plans since last September. Sales have been strong across the board in both basic and seasonal categories....

***MIK is therefore showing strong defensive characteristics (in addition to being an attractive growth story). We believe MIK is better insulated from economic downturns than are most retailers because it is generally less costly for a consumer to do a craft project than to buy a comparable finished product.***

•     <u>Sanders Morris Harris (Aug. 29, 2002; D. Brunello): BUY; Price Target of $56</u>

***MIK: Blows Through Expectations... Again ! Increasing Estimates, Reiterate BUY***

\* \* \*

We believe Michaels is well positioned to continue its strong sales and earnings performance.

(emphasis added)

39.     On September 5, 2002, the Company issued another release. This release purported to announce that Michaels Stores August sales improved an additional 12% with a same-store sales increase of 6%. For the month of August 2002 purported sales increased 12%, to $174.1 million, from $155.4 million for the same period in 2001. Year-to-date sales of $1.354 billion for fiscal 2002 increased 16% from $1.166 billion for the same period last year while same-store sales were up 7% year-to-date.

40.     The same day defendants released these excellent monthly sales results, *SmartMoney.com* published a report on the Company entitled, ***"We Love a Surprise."*** This story highlighted the fact that Michaels Stores had seemingly outperformed otherwise negative market conditions to achieve very positive results, in part, as follows:

- 17 -



> If you're any kind of market watcher, you know how hard it's been to whistle a chipper tune lately. Tuesday's 355-point, or 4.1%, drop in the Dow Jones Industrials certainly didn't inspire any spontaneous renditions of "Happy Days Are Here Again." And after Thursday's 141-point drop, the Dow sat 17.5% lower for the year. As for the other broad indexes, well, they aren't faring much better.
>
> But ***despite the recent dreariness, a few companies have sounded some delightfully cheery notes. Take arts-and--crafts retailer Michaels Stores***. Last Wednesday it posted a 12-cent-per-share earnings surprise for the second quarter, 67% better than Wall Street expected. Michaels' stock? It jumped 13.7% on the news.

(emphasis added)

41.    At the same time the *SmartMoney.com* report was published, *CBS Marketwatch* also issued a similar report which stated that August was a "slow" month for U.S. retailers, with "decidedly lackluster sales results reported by many of the nation's retailers" and "most department store chains [coming] in with August same-store sales results below Wall Street's consensus, as did retailing giant Wal-Mart Stores and the majority of apparel retailers." *CBS Marketwatch* too, highlighted the fact that ***Michaels Stores was one of the "few bright spots... amid the retailing gloom."***

42.    The materially false and misleading statements issued by the Company had their intended effect. As evidence of this, on September 9, 2002, H.C. Wainwright & Co. initiated coverage of the Company with an "OUTPERFORM" rating and published a report which stated, in part, the following:

*    Michaels Stores has established itself as ***a specialty retailer that dominates its category*** (arts and crafts) perhaps more than any other company in retailing.

*    ***A multi year investment program in sophisticated distribution and information systems is beginning to pay off in a big way***, as evidenced by the huge upside earnings surprises reported in recent quarters.

*    Following the release of 2Q02 results on August 281, we believe that Michaels' ***earnings power is far greater than current levels.***

*    Although the shares of MIK are trading near their 52-week high, ***the stock remains conservatively valued***, in our opinion, at only 18.7x our 2003 EPS estimate.

- 18 -

- *We are initiating coverage of Michaels Stores with an Outperform rating.*

(emphasis added)

43.    While investors had no way of knowing this at the time, and as defendants did their best to ensure that investors would not know the true financial condition of the Company, during the Relevant Period defendants were already taking measures to lessen the inevitable adverse impact which the belated disclosure of the true financial condition of the Company would ultimately have on the price of Michaels Stores common stock. Thus, on September 12, 2002, defendants issued a release which announced that they had increased the Company's stock repurchase program, which would authorize defendants to purchase an additional 1.55 million shares of Michaels Stores common stock in the open market. This release also stated the following:

> Michaels. Stores, Inc. announced today that its Board of Directors has approved a repurchase of up to an additional one million shares of the Company's Common Stock under its Stock Repurchase Program. This brings the total shares available to be repurchased to 1.558 million. These repurchases will be made from time to time, as market conditions warrant, in the open market or in negotiated transactions, and will be funded from available working capital and cash flow from operations.
>
> [Defendant] Rouleau... said, *"We are pleased to announce the continuation of our repurchase program. We do not currently expect share repurchases to be made prior to the fourth quarter of this fiscal year, unless, of course, market conditions encourage us to act sooner."*
>
> Since July 1999 the Company has repurchased approximately 11.4 million shares of its Common Stock and currently has approximately 66.5 million shares outstanding.

(emphasis added).

44.    Immediately after this release was issued by the Company, on September 12, 2002, *TheStreet.com* Senior Columnist Herb Greenberg published his reaction, which was that, ostensibly, Michaels Stores picked an "odd time for a buyback," in addition to stating the following:

Thursday thwack:

> Messing with Michaels: Michaels Stores, an active buyer of its own stock, today
> authorized the repurchase of an additional 1 million shares from time to time, on the open
> market or in negotiated transactions. The additional buybacks, Michaels said, won't take
> place until the fourth quarter (starting in November), unless market conditions
> change.

45.     At the same time defendants were announcing an expanded Company share buy-

back, during the first two weeks of September certain of the defendants were dumping their own shares

into the market while in possession of the knowledge that gross margins had been artificially

inflated in the second quarter and that this margin improvement could not be maintained. Such

illegal insider stock sales included the following:

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| DECARO | 09/03/02 | 34,999 | $45.210 | $1,582,305 |
| | | 34,999 | | $1,582,305 |
| HIEMENZ | 09/04/02 | 1,000 | $46.050 | $ 46,050 |
| | 09/04/02 | 49.002 | $46.000 | $2.254.092 |
| | 09/06/02 | 11,666 | $47.000 | $ 548,302 |
| | | 61,668 | | $2,848,444 |
| ROULEAU | 09/04/02 | 4,200 | $46.100 | $ 193,620 |
| | 09/04/02 | 21,900 | $46.000 | $1,007,400 |
| | 09/04/02 | 2,000 | $46.090 | $ 92,180 |
| | 09/04/02 | 3,600 | $46.070 | $ 165,852 |
| | 09/04/02 | 2,000 | $46.140 | $ 92,280 |
| | 09/04/02 | 3,000 | $46.200 | $ 138,600 |
| | 09/04/02 | 500 | $46.060 | $ 23,030 |
| | 09/04/02 | 4,100 | $46.010 | $ 188,641 |
| | 09/04/02 | 200 | $46.020 | $ 9,204 |
| | 09/04/02 | 1,000 | $46.110 | $46,110 |
| | 09/04/02 | 2,800 | $46.080 | $ 129,024 |
| | 09/04/02 | 2,200 | $46.040 | $ 101,288 |
| | 09/04/02 | 2,500 | $46.030 | $ 115,075 |
| | 09/06/02 | 7,500 | $48.450 | $ 363,375 |
| | 09/06/02 | 1,200 | $48.370 | $ 58,044 |
| | 09/06/02 | 4,900 | $48.010 | $ 235,249 |
| | 09/06/02 | 2,200 | $47.510 | 104,522 |
| | 09/06/02 | 2,500 | $48.170 | $ 120,425 |
| | 09/06/02 | 5,000 | $48.250 | $ 241,250 |
| | 09/06/02 | 10,100 | $48.000 | $ 484,800 |

|  | 09/06/02 | 100 | $47.580 | $4,758 |
|---|---|---|---|---|
|  | 09/06/02 | 200 | S47.530 | $9,506 |
|  | 09/06/02 | 3,200 | $48.350 | $ 154,720 |
|  | 09/06/02 | 2,500 | $47.750 | $ 119,375 |
|  | 09/06/02 | 10,000 | $47.950 | $ 479,500 |
|  | 09/06/02 | 600 | $48.360 | $29,016 |
|  |  | 100,000 |  | $4,706,844 |
| SPENCER | 09/03102 | 2,000 | $45.270 | $ 90,540 |
|  | 09/05/02 | 2,000 | $46.250 | $ 92,500 |
|  | 09/06/02 | 2,000 | $47.250 | $ 94,500 |
|  | 09/09/02 | 2,000 | $48.250 | $ 96,500 |
|  | 09/11/02 | 2,166 | $49.330 | $ 106.849 |
|  |  | 10,166 |  | $ 480,889 |

46.     On September 17, 2002, Michaels Stores issued a release in which it announced the certification of the Company's financial results. This release stated that the Company's Chief Executive Officer, defendant Rouleau, and its Chief Financial Officer, defendant DeCordova, had submitted certifications to the SEC stating that they had complied with both SEC Order 4-460 and the Sarbanes-Oxley Act of 2002. Compliance with this Act demanded that the financial statements submitted to the SEC were true, accurate and correct.

47.     The same day, September 17, 2002, Michaels Stores filed with the SEC its financial results for second quarter 2002, the period ended August 3, 2002. The 10Q was signed by Defendant DeCordova.   This filing reiterated much of the same financial information previously announced on August 28, 2002. Defendants DeCordoa and Michael Rouleau certified the accuracy and truthfulness of the 10Q and the financial statements contained therein.   In addition, however, buried in the notes to the Company's financial statements, for the first time, the second quarter 2002 Form 10-Q revealed that defendants had substantially inflated the Company's second quarter gross margins by including in its financial results for the second quarter 2002 at least $14.8 million in "reserve reversals" related to a reserve for impaired inventory taken at the end of the prior year, as follows:

Cost of sales and occupancy expense, as a percentage of net sales, for the second quarter of fiscal 2002 was 63.9°%, a decrease of 3.3% compared to the second

quarter of fiscal 2001. This decrease was primarily attributable to improved merchandise margins and a leveraging of store occupancy expense on higher average net sales per store compared to the second quarter of fiscal 2001.

In addition, in the second quarter of fiscal 2002, we fully utilized the $14.8 million markdown reserve originally recorded in the fourth quarter of fiscal 2001 to offset the liquidation of certain merchandise that did not conform to each store's specific plan-o-gram SKU program.

48.    The statements contained in the Company's September 17, 2002 release and 10-Q referred to above in ¶¶46-47 were each materially false and misleading when made as they misrepresented and/or omitted to disclose the adverse facts and conditions which defendants knew, or recklessly disregarded, existed at that time, the disclosure of which was necessary to make such statements not false and/or misleading for the reasons stated herein in ¶36, *supra*.

49.    *After meeting with management of the Company*, SWS Securities published a report which reiterated its BUY rating and a $57 price target for shares of Michaels Stores. In addition, the report stated, in part, the following:

Yesterday, *we had a very positive meeting with management*. We are optimistic about the fourth quarter. We believe that the company is ready earlier for the holiday season. Combined with the allocation system implemented last year, *we believe there is upside to our 4th quarter comp and earnings estimates...* . We are reiterating our Strong Buy rating and maintaining our 12 month price target of $57 based on 23x our FY03 EPS estimate of $2.48.

(emphasis added).

50.    On October 10, 2002, Michaels Stores issued a release which purported to announce that September same-store sales climbed 10%, with total sales up 25%. This release also increased third quarter 2002 and full year EPS estimates, and stated the following:

Michaels Stores, Inc. today reported that same-store sales for the month of September increased 10%, four percentage points higher than previous expectations. Total sales for the month increased 25% to $296.1 million from $236.3 million for the same period last year. Same-store sales were up 7% year-to-date while total sales of $1.650

- 22 -



billion for fiscal 2002 increased 18% from $1.402 billion for the same period last year.

[Defendant] Rouleau said, "We are extremely pleased with our performance in September. While we are sensitive to current concerns about consumer spending, we believe that the significant improvements we continue to make in our operations will continue to propel our same store sales and profit growth. We expect same-stores sales for October to increase between 4% to 6% and third quarter same-store sales to increase 6% to 7%. We have also raised our earnings estimates per diluted share to $.40 for the third quarter and $2.10 for the full fiscal year."

\* \* \*

As previously reported, the Company's Executive Vice President - Chief Financial Officer, Bryan DeCordova, has announced his resignation effective October 31, 2002. The Company continues a nationwide search for a new CFO. Until a new Chief Financial Officer has been appointed, all financial inquiries should be directed to Chris Holland, Vice President - Finance.

51.    The statements contained in the Company's October 10, 2002 release referred to above in ¶50 were each materially false and misleading when made as they misrepresented and/or omitted to disclose the adverse facts and conditions which defendants knew, or recklessly disregarded, existed at that time, the disclosure of which was necessary to make such statements not false and/or misleading for the reasons stated herein in ¶36, *supra*.

52.    The same day, *Reuters* also reported that Michaels Stores had seemingly forecast third-quarter earnings near the "high-end of Wall Street's estimates, after September sales at stores open at least a year, or same-store sales, increased 10%." Again, *Reuters* reiterated justifications provided by defendants for their trend-beating results, such as the fact that the Company's business had benefited from a push by Americans to engage more in home-bound activity after last year's September 11 attacks. Also according to *Reuters*, Michaels Stores forecasted third quarter profit of $0.40, and full-year profit of $2.10. Analysts polled by research firm Thomson First Call forecast third quarter profit to range from $0.37 to $0.41, with a mean at $0.39. A year earlier the retailer reported a third quarter profit of $0.28 a share, and a full-year profit of $1.46 a share. For the full-year the

- 23 -

analysts' average estimate was $2.12, on estimates ranging from $2.09 to $2.20. Total sales for September purportedly increased 25% to $296.1 million from $236.3 million last year.

53.    As further evidence that the materially false and misleading statements issued by the Company had their intended effect, following the publication of the Company's October 10, 2002 release, analysts issued very positive recommendations on Michaels Stores, issuing "Strong Buy" opinions and price targets as high as $61 per share. The analysts also recommended that customers purchase shares of Michaels Stores, as follows:

- SWS Securities (Oct. 10, 2002; O. Tangun): STRONG BUY, Price Target of $57.00

  The company reported a strong 10% same-store sales increase in September, exceeding our mid single-digit comp estimate. MIK reported a 10% same-store sales increase in the same period last year.... The company increased 3Q02 EPS guidance to $0.40 and FY02 EPS guidance of $2.10. Management indicated the average ticket increased 4% and the average customer transaction was up 6% from last year.... *We are reiterating our Strong Buy rating and increasing our 12-month price target from $54 to $57 based on 23x our FY03 EPS estimate of $2.48.*

- CS First Boston (Oct. 10, 2002; G. Balter): BUY, Price Target of $55.00

  MIK reported September same-store sales up 10%, on top of a 10% gain last year - reflecting continued acceleration at MIK even as sales at other retailers lag.

  *Given strong sales in the first two months of Q3, we are raising our comp expectation to 6%, and as a result are raising our 3Q EPS estimate to $o. 41 from $0.39. We are also raising our full year 2002 forecast to $2.13 from $2.10 and our 2003 EPS estimate to $2.50 from $2.48.*

- Wedbush Morgan Securities (Oct. 10, 2002; J. Bogucki-Storms): BUY, Price Target of $61

Michaels Stores Reported a Blowout Month as September Comps Increased

* * *

*September Sales Results Are Way above Guidance and Estimates-Again.* Michaels reported another blowout month as September sales increased 25% to $296 million from $236 million LY and September comps increased an impressive 10% compared to a difficult 10% LY, significantly ahead of the guided 4-6% range and our

- 24 -

5% estimate.... Traffic trends continue to be strong.... We believe that the average ticket continues to benefit from increased in-stock levels as a result of ongoing supply chain initiatives.... Sales continued to be solid across all regions, with the greatest comp increase coming from the Northeast, followed by the Southeast and the West Coast. *We are maintaining our October comp estimate of 5% and increasing our Q3 comp estimate from 5% to 7% based on solid results and revised guidance.*

- <u>SWS Securities (Nov. 5, 2002, O. Tangun): STRONG BUY-Price Target of $57.00</u>

The company reports October same-store sales Thursday. *Based on our field research, we believe the company will meet or exceed the high-end of its-guidance of 4% to 6% comps.* We are currently modeling a 5% increase in same-store sales.... As a result of the strong seasonal sell-through, we believe there is upside to our margin estimates.

(emphasis added)

54.     In addition to their prior stock sales, at the same time defendants were guiding the market higher and artificially inflating the price for Michaels Stores shares, certain defendants continued liquidating their personally held Company shares. These sales included the following.

| Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| MARCUS | 10/15/02 | 4,500 | $42.800 | $ 192,600 |
| | 10/15/02 | 20,000 | $42.900 | $ 858,000 |
| | 10/15/02 | 500 | $42.820 | $  21,410 |
| | 10/16/02 | 200 | $42.000 | $   8,400 |
| | 10/17/02 | 5,000 | $42.600 | $ 213,000 |
| | 10/17/02 | 6,100 | $42.300 | $ 258,030 |
| | 10/17/02 | 5,000 | $42.620 | $ 213,100 |
| | 10/17/02 | 4,800 | $42.990 | $ 206,352 |
| | 10/17/02 | 3,900 | $42.340 | $ 165,126 |
| | | 50,000 | | $2,136,018 |
| ROULEAU | 10/18/02 | 400 | $45.050 | $  18,020 |
| | 10/18/02 | 5,800 | $45.100 | $ 261,580 |
| | 10/18/02 | 1,500 | $45.150 | $  67,725 |
| | 10/18/02 | 1,000 | $45.160 | $  45,160 |
| | 10/18/02 | 400 | $45.110 | $  18,044 |
| | 10/18/02 | 1,500 | $45.120 | $  67,680 |
| | 10/18/02 | 9,400 | $45.020 | $ 423,188 |
| | 10/18/02 | 5.000 | $45.040 | $ 225,200 |
| | | 25,000 | | $1,126,597 |

| | | | | |
|---|---|---|---|---|
| SADLER | 10/21/02 | 2,500 | $46.200 | $ 115,500 |
| | 10/21/02 | 100 | $46.120 | $ 4,612 |
| | 10121/02 | 600 | $46.010 | $ 27,606 |
| | 10/21/02 | 100 | $46.150 | $ 4,615 |
| | 10/21/02 | 15,700 | $46.000 | $ 722,200 |
| | 10/21/02 | 300 | $46.140 | $ 13,842 |
| | 10/21/02 | 300 | $46.130 | $ 13,839 |
| | 10/21/02 | 400 | $46.050 | $ 18.420, |
| | | 20,000 | | $ 920,634 |
| TUCKER | 10/21/02 | 33,333 | $45.540 | $1,517,985 |
| | | 33,333 | | $1,517,985 |

## MICHAELS STORES' TRUE FINANCIAL
## CONDITION IS BELATEDLY DISCLOSED

55.     On November 7, 2002, defendants issued a release which disclosed for the first time that

the Company was operating *well below guidance* and that Michaels Stores would substantially

reduce estimates going forward, in part, as follows:

> Michaels Stores, Inc. today reported that total sales for the month of October
> increased 6 % to $234.5 million from $220.4 million for the same period last year. Same-
> store sales for the month increased 2%. Total sales for the third quarter
> increased 15% to $704.6 million from $612.0 million for the same period last year. Same-
> store sales for the quarter increased 6%. Year-to-date sales of $1.884 billion for fiscal
> 2002 increased 16% from $1.623 billion for the same period last year while same-store
> sales were up 7% year-to-date.
>
> *The Company also reported that it has revised its outlook for the fourth
> quarter. Noting that the consumer confidence index had fallen to a nine year low,
> [defendant] Rouleau said, "While we feel we have never been better prepared for
> the Holiday season, a shift in the retail environment in general and waning
> consumer confidence has caused us to modem our sales and earnings
> expectations for the balance of this year.* We are now looking for same-store sales
> in the fourth quarter to be up one percent versus our previous guidance of up two to
> three percent. Based on this revised forecast, we expect earnings for the full year to be
> five cents less per diluted share than our previous guidance of $2.10 per diluted share."

(emphasis added)

56.     Immediately following the publication of this release, as soon as trading of Michaels

Stores began, shares plummeted over 30%, or over $11.18 per share, more than wiping out all gains made

- 26 -

during the Relevant Period, after reporting same-store sales gains for October that were one-third to one-half expectations. According to *CBS Marketwatch*, during the conference call held after the publication of the November 7, 2002 release, defendants blamed a variety of factors for the purported sudden decline, including that: (i) sales were negatively affected by the Maryland-area sniper attacks; (ii) as a result of the media attention over the sniper in Maryland, and because the Company's name was mentioned in the media at the same time and in the same context, this somehow impacted results nationally; (iii) consumers were shifting their shopping resources to winter apparel, rather than arts and crafts; and (iv) customer store traffic fell sharply through October due to restrained consumer spending amid an uncertain U.S. economy - the Company's first decline in customer traffic in any month this year.

57.    In the conference call that accompanied this release, for the first time defendants also publicly commented on the Company's July 2002 $14.8 million reserve reversal, a reserve originally established in January 2002 and reversed in the second quarter of fiscal 2002. During the call, however, defendants dismissed the significance of this accounting mechanization, claiming that the "profit and loss impact" on Michaels Stores was zero. At least one analyst who called into the conference call vehemently disagreed, and directly accused Company insiders of trading their Michaels Stores shares while in possession of material adverse non-public information. The analyst, Dan Farb of Highfield Capital, first said it raised serious questions that defendants had taken such a "reserve reversal" in the second quarter 2002 and had not even mentioned it until the conference call which followed the insiders' sale of over $15.3 million of Company stock. More specifically, Farb stated that this undisclosed reversal of the prior accrual would have had the effect of artificially inflating the gross margins of goods during the second quarter, since the margin on the incremental piece of inventory which was liquidated to offset the reserve effectively had a zero cost

- 27 -

basis, and this added 100% to margin improvement. This was improper because it allowed defendants to create the materially false impression that the Company had achieved record results in the fiscal second quarter, when, at that time, Michaels Stores was *already* suffering from the same adverse market conditions as were most if not all retailers.

58.     Contrary to defendants' false representations, they had no secret formula for success in a down market, other than misrepresenting the financial condition of the Company for at least one fiscal quarter, so that the insiders could bail out with huge cash cushions. Remarkably, however, when asked by the analysts why defendants had failed to disclose this material "reversal" until the following quarter conference call, one defendant simply stated, "I don't know." Defendants did protest, however, that there was no correlation between the massive insider selling and the failure to disclose this material adverse event. Instead, defendants attempted to explain how, since much of the executives' wealth was tied up in options and since those options would expire in June of 2003 and could only be exercised and sold during certain "windows," the insiders had to sell their stock. Defendants' explanation simply dismisses the fact that defendants sold their stock while in possession of material adverse non-public information- which is illegal.

59.     In fact, this statement provides insight into defendants' motive for selling their stock when they did. Since the options expired within months, and since there were only certain periods when Company insiders could sell their stock, defendants did everything possible to inflate and maintain the price of Michaels Stores stock at artificial levels throughout the Relevant Period so as to allow them to liquidate their private holdings before the price of the Company's stock deteriorated and eroded and while defendants could reap millions of dollars more in exchange for their Company shares.

60.     Immediately after the defendants made their announcement and hosted this conference call, Merrill Lynch downgraded its rating on shares of Michaels Stores to "neutral" from "buy." Analyst Douglas Neviera said in a research note that "[t]he traffic decline is concerning as we enter the peak holiday season given that seasonal margins could be at greater risk if traffic levels are below expectations and stores must resort to greater markdowns." Neviera reduced his EPS estimate for the Company for 2002 to $2.00 from $2.17 and to $2.40 from $2.55 in 2003.

61.     The market for Michaels Stores common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Michaels Stores common stock traded at artificially inflated prices during the Relevant Period. During the Relevant Period investors acquired Michaels Stores common stock relying upon the integrity of the market price of Michaels Stores common stock and market information relating to Michaels Stores, and were damaged thereby. This resulted in numerous securities class action lawsuits being filed against the company.

62.     Throughout the Relevant Period, the defendants disseminated and/or approved the false statements specified above, which they knew were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Furthermore, the director defendants failed to discharge their responsibilities of oversight of the Company's affairs. Because of the actions described herein, securities class actions have been filed against the Company which have had the effect of impairing the Company's credibility in the market place and elsewhere. The defendants' malfeasance and/or misfeasance has exposed the Company to millions of dollars in liability to investors in class action lawsuits which have been

filed against the Company as well as current investigatory and litigation expenses which will continue into the future.

63.    Further the Selling Defendants, including defendant director Marcus, breached their duties of loyalty to the Company and its shareholders by selling Michaels shares during the Relevant Period while in possession, and on the basis, of material non-public information concerning the Company's financial performance and condition and its business prospects.  The chart below details the insider trading, which occurred during the Relevant Period, as follows:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| DECARO | 09/03/02 | 34,999 | $45.210 | $ 1,582,305 |
|  |  | 34,999 |  | $1,582,305 |
| HIEMENZ | 09/04/02 | 1,000 | $46.050 | $ 46,050 |
|  | 09/04/02 | 49,002 | $46.000 | $ 2,254,092 |
|  | 09/06/02 | 11,666 | $47.000 | $ 548,302 |
|  |  | 61,668 |  | $2,848,444 |
| MARCUS | 10/15/02 | 4,500 | $42.800 | $ 192,600 |
|  | 10/15/02 | 20,000 | $42.900 | $ 858,000 |
|  | 10/15/02 | 500 | $42.820 | $21,410 |
|  | 10/16/02 | 200 | $42.000 | $8,400 |
|  | 10/17/02 | 5,000 | $42.600 | $ 213,000 |
|  | 10/17/02 | 6,100 | $42.300 | $ 258,030 |
|  | 10/17/02 | 5,000 | $42.620 | $ 213,100 |
|  | 10/17/02 | 4,800 | $42.990 | $ 206,352 |
|  | 10/17/02 | 3,900 | $42.340 | $ 165,126 |
|  |  | 50,000 |  | $2,136,018 |
| ROULEAU | 09/04/02 | 4,200 | $46.100 | $ 193,620 |
|  | 09/04/02 | 21,900 | $46.000 | $1,007,400 |
|  | 09/04/02 | 2,000 | $46.090 | $ 92,180 |
|  | 09/04/02 | 3,600 | $46.070 | $ 165,852 |
|  | 09/04/02 | 2,000 | $46.140 | $ 92,280 |
| Name | Date | Shares | Price | Proceeds |
|  | 09/04/02 | 3,000 | $46.200 | $ 138,600 |
|  | 09/04/02 | 500 | $46.060 | $ 23,030 |
|  | 09/04/02 | 4,100 | $ 46.010 | $ 188,641 |
|  | 09/04/02 | 200 | $46.020 | $ 9,204 |
|  | 09/04102 | 1,000 | $46.110 | S 46,110 |
|  | 09/04/02 | 2,800 | $46.080 | $ 129,024 |
|  | 09/04/02 | 2,200 | $46.040 | $ 101,288 |
|  | 09/04/02 | 2,500 | $46.030 | $ 115,075 |

|  |  |  |  |
|---|---|---|---|
|  | 09/06/02 | 7,500 $48.450 | S 363,375 |
|  | 09/06/02 | 1,200 $48.370 | $ 58,044 |
|  | 09/06/02 | 4,900 $48.010 | $ 235,249 |
|  | 09106/02 | 2,200 $47.510 | $ 104,522 |
|  | 09/06/02 | 2,500 $48.170 | $ 120,425 |
|  | 09/06/02 | 5,000 S48.250 | $ 241,250 |
|  | 09/06102 | 10,100 $48.000 | $ 484,800 |
|  | 09/06/02 | 100 $47.580 | $ 4,758 |
|  | 09/06/02 | 200 $47.530 | $ 9,506 |
|  | 09/06/02 | 3,200 $48.350 | $ 154,720 |
|  | 09/06/02 | 2,500 $47.750 | $ 119,375 |
|  | 09/06/02 | 10,000 $47.950 | $ 479,500 |
|  | 09/06/02 | 600 $48.360 | $ 29,016 |
|  | 10/18/02 | 400 $45.050 | $ 18,020 |
|  | 10/18/02 | 5,800 $45.100 | $ 261,580 |
|  | 10/18/02 | 1,500$45,150 | $ 67,725 |
|  | 10118/02 | 1,000 $45.160 | $ 45,160 |
|  | 10/18/02 | 400 $45.110 | $ 18,044 |
|  | 10/18/02 | 1,500 $45.120 | $ 67,680 |
|  | 10/18/02 | 9,400 $45.020 | $ 423,188 |
|  | 10/18/02 | 5,000 $45.040 | $ 225,200 |
|  |  | 125,000 | $ 5,833,441 |
| SADLER | 10/21/02 | 2,500 $46.200 | $ 115,500 |
|  | 0/21/02 | 100$46,120 | $ 4,612 |
|  | 10/21/02 | 600 $46.010 | $ 27,606 |
|  | 10/21/02 | 100 $46.150 | $ 4,615 |
|  | 10/21/02 | 15,700 $46.000 | $ 722,200 |
|  | 10/21/02 | 300 $46.140 | $ 13,842 |
|  | 10/21/02 | 300 $46.130 | $ 13,839 |
|  | 10/21/02 | 400 $46.050 | $ 18,420 |
|  |  | 20,000 | $ 920,634 |
| SPENCER | 09/03/02 | 2,000 $45.270 | S 90,540 |
|  | 09/05/02 | 2,000 $46.250 | $ 92,500 |
|  | 09/06/02 | 2,000 $47.250 | $ 94,500 |
|  | 09/09/02 | 2,000 $48.250 | $ 96,500 |
|  | 09/11/02 | 2,166 $ 49.330 | $ 106,849, |
|  |  | 10,166 | $ 480,889 |
| TUCKER | 10/21/02 | 33,333 $ 45.540 | $1,517.985 |
|  |  | 33,333 | $1,517,985 |
| Grand Total: |  | 335,166 | $15,319,716 |

64.    In addition, such stock sales by the Selling Defendants during the Relevant Period were

highly unusual and further demonstrate the Selling Defendants' scienter, because they represent very

- 31 -



large, and in some cases 100%, of the stock which was owned by such Selling Defendants during that time and, in addition, such sales were unusual because they represented much larger sales 'than in similar periods the prior year, as is indicated below:

11/01-8/02

| Defendant | Holdings | Relevant Period Sales | Relevant Period Sales | % of Hldgs Sold |
|---|---|---|---|---|
| T. DeCaro | 34,999 | 0 | 34,999 | 100.00% |
| D. Hiemenz | 68.465 | 33.332 | 61.668 | 90.07% |
| B. Marcus | 120.000 | 15.000 | 50.000 | 41.67% |
| M. Rouleau | 466.518 | 28.168 | 125.000 | 26.79% |
| E. Sadler | 79.166 | 10.000 | 20.000 | 25.26% |
| R. Spencer | 10.166 | 1.500 | 10.166 | 100.00% |
| JB Tucker | 52,403 | 0 | 33,333 | 63.61% |

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

65.    Plaintiff brings this action derivatively in the right and for the benefit of the Nominal Defendant, Michaels Stores to address injuries suffered and to be suffered by Michaels Stores as a result of Defendants' breach of their fiduciary duties to Michaels Stores and its shareholders. This is not a collusive action to compel jurisdiction on this Court, which it would not otherwise have.

66.    Plaintiff would adequately and zealously represent the interests of Michaels Stores and its shareholders in asserting and prosecuting Michaels Stores' rights and its claims against the defendants.

67.    Plaintiff is an owner of Michaels Stores common stock and was an owner of Michaels Stores common stock at all times relevant to the defendants' wrongful course of conduct alleged herein and continuously to the present.

- 32 -

68.      Michaels Stores Board of Directors is currently composed of six (6) members –
Charles Wyly, Sam Wyly, Richard Marcus, Richard E. Hanlon, Liz Minyard, and CeCe Smith.
All current directors, except for Smith, have been named as Defendants in this lawsuit.

69.      Defendant Charles Wyly became a Director of the Company in 1984.  He served
as Vice Chairman of the Board from 1985 until 2001 when he became Chairman of the Board, the
position which he currently occupies.   Charles Wyly earns $37,500.00 per month serving as
Chairman of the Board of the Company.   Charles Wyly received 117,500 options during fiscal
year 2000.  In fiscal year 2002, the Company paid $240,856.00 in salary to Donald R. Miller, Jr.,
Vice President-Market Development of Michaels.  Miller also earned a bonus of $117,500.00 and
$18,390.00 for the personal use of a Company owned automobile and the transfer of that
automobile, valued at $55,892.00, to Mr. Miller and $2,605.00 for other employee benefits.  In
fiscal year 2002 Michaels granted options to Mr. Miller exercisable for 25,000 shares of common
stock at the exercise price of $34.10 per share.  Mr. Miller is the son-in-law of Charles Wyly.
Charles Wyly is an inside Director and is not independent.  He is excluded from the list of
independent Directors in the Company's 2003 proxy statement.

70.      Sam Wyly has served as Vice Chairman of the Board Directors of Michaels since
July 2001 and as a Director of Michaels since 1984.  He served as Chairman of the Board from
1984 until July 2001.  Sam Wyly receives $18,750.00 per month for serving as Vice Chairman of
the Board.   Sam and Charles Wyly founded Michaels Stores in 1984 and have dominated and
controlled the Company and its Board of Directors since such time.  For years the Wylys staffed
the Board with family members and controlled the Company's Nominating and Compensation
committees.  Sam Wyly is an inside director, not an independent director and is excluded from the
Company's list of independent directors in its 2003 proxy.

- 33 -

71.     Richard Marcus has been a Director of the Company since July 1999.  He has served on the Company's Audit Committee, Compensation Committee and Governance and Nominating Committee since at least fiscal year 2001.  Marcus sold 50,000 shares of Michaels stock during the Relevant Period based upon his knowledge of material non-public adverse information for gross proceeds of more than $2.8 million.  This amounted to 41.67% of his personal holdings in Company stock.

72.     Defendant Hanlon has served as a Director of the Company since April 1990.  Hanlon also served as a Director of GreenMountain.Com, a Wyly owned business.

73.     Defendant DeCordova, Michaels former Chief Financial Officer, who was Chief Financial Officer during the Relevant Period, also currently serves as the Chief Financial Officer of Green Mountain Energy, a Wyly owned business in which Sam Wyly serves as a Director.

74.     Minyard became a Director of the Company in March 2002.  She currently serves on the Company's Compensation committee and its Audit committee.

75.     Smith became a member of the Company's Board of Directors in October 2002.  She currently serves on the Company's Audit Committee.

76.     Michaels Board of Directors is controlled and directed by Defendants Sam Wyly and Charles Wyly, the Company's founders, and longtime Chairmen and Vice Chairmen of the Board.  Because of their power and influence over the Board, the other Directors are not capable of making a decision independent of the Wyly brothers concerning whether to institute an action against them or the other defendants.

77.     As a result of the facts set forth herein, plaintiff has not made any demand on Michaels Board of Directors to institute this action against the defendants.  Such demand would

- 34 -

be a futile and useless act because a majority of the Board is incapable of making a disinterested

and independent decision to prosecute this action for the following reasons:

a.  Each of the defendants exhibited a sustained and systematic failure to fulfill their

fiduciary duties, which could not have been an exercise of good faith business

judgment and amounted to gross negligence and extreme recklessness;

b.  The defendants had a responsibility, obligation, and fiduciary duty to assure that

all press releases and filings of SEC reports were accurate and that all financial

controls and other oversight procedures were in place that would have detected

and prevented the false and misleading statements put out by the Company to the

public that are described in this complaint;

c.  In order to bring this suit, the defendants would be forced to sue themselves

which they will not do, thereby excusing demand;

d.  Michaels has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein; yet, the Director Defendants have not filed any

lawsuits against the individuals (including themselves) who were responsible for

the wrongful conduct which caused the filing of securities class actions against

Michaels, nor have they attempted to recover from the responsible persons any

part of the damages Michaels suffered and will suffer thereby;

e.  If the defendants were to bring this derivative action against themselves, they

would thereby further expose their own negligence and misconduct which

underlies the allegations against the Company contained in the class action

complaints for violations of federal securities law.   Such admissions would

greatly increase the probability of their personal liability for the wrong doing

alleged therein, in an amount likely to be in excess of any insurance coverage available to the defendants; and

f.  The Director Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any of the Director Defendants initiated an action against any of the other Director Defendants named herein.  Therefore, Michaels' Board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the defendants because to do so would result in the loss of their insurance coverage.

g.  There is a substantial likelihood that defendants are personally liable to Michaels for the damages it has sustained and will sustain in the future as a result of the wrongs described above.  As a consequence, each defendant in an irreconcilable conflict of interest regarding the prosecution of this action and has a personal pecuniary interest that would be adversely affected if the claims herein were pursued.  Accordingly, defendants cannot exercise the requisite independence and disinterestedness necessary to consider a pre-suit demand impartially and in good faith.

78.  Plaintiff has not made any demand on the shareholders of Michaels to institute this action since demand would be a futile and useless act for the following reasons:

a.  Michaels is a publicly traded company with thousands of shareholders;

b.  Making demand on such a number of shareholders would be impossible for plaintiff, who has no way of finding out the names, addresses, or telephone numbers of shareholders; and

c.  Making demand on all shareholders would force plaintiff to

incur huge expenses assuming all shareholders could even be individually identified.

79.     Michaels has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to:

a.     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

b.     Costs and legal fees for defending Michaels and the Defendants against private class action litigation arising from the illegal and improper conduct alleged herein.

80.     In addition, Michaels and its shareholders will continue to be damaged by the tarnishment of Michaels' reputation and the impairment of its ability to obtain capital through credit and equity markets.  Plaintiff incorporates by reference and realleges each of the foregoing allegations, as though fully set forth herein.

## COUNT I

## DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR
## BREACH OF FIDUCIARY DUTY

81.     Plaintiff incorporates by reference and realleges each of the foregoing alegations, as though fully set forth herein.

82.     Defendants have breached their fiduciary duties by making, or permitting others in the Company to make false and misleading statements to the public and investors and/or by trading Company shares based on inside information all of which resulted in numerous class action lawsuits against the Company and impairment of the Company's ability to secure needed capital.

- 37 -

83.     The defendants owe a fiduciary duty to Michaels and its shareholders to supervise the issuance of its press releases and public filings to ensure that they are truthful and accurate and that they conform with federal and state securities law.   The defendants breached their fiduciary duties by failing to properly supervise and monitor Michaels' internal controls and the adequacy of same by allowing misleading statements to be issued and made in press releases, SEC filings and interviews with analysts.   The defendants through the wrongful conduct alleged herein have breached these duties to the Company and its shareholders.

84.     The defendants have engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Michaels complied with federal and state laws.

85.     As officers and/or members of the Board of Directors of Michaels, the defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violation of the federal securities laws as alleged herein.   Each of them had knowledge of and actively participated in and approved of the wrongdoings alleged herein or abdicated his/her responsibilities to prevent these wrongdoings.   The alleged acts of wrongdoing subjected Michaels to unreasonable risks of loss and resulted in class action lawsuits being filed against the Company.

86.     Each of the defendants knew, or should have known in the absence of gross recklessness, that the Company was reporting false and materially misleading information to the public and shareholders.

87.     Each of the defendants' acts in causing or permitting the Company to file with the SEC and to disseminate to the investing public material misrepresentations and omissions concerning Michaels' revenues, income, expected financial results and business prospects have

Case 3:03-cv-020●M    Document 1    Filed 09/11/03    ●ge 42 of 45    PageID 42

subjected the Company to liability for violation of federal and state law, and therefore were not the product of a valid exercise of business judgment and was a complete abdication of their duties as officers and directors of the Company. As a result of the defendants' breaches, Michaels is the subject of major securities fraud class action lawsuits by defrauded investors, and has had its reputation in the business community irreparably tarnished, and has thus been damaged.

## COUNT II

### MISAPPROPRIATION OF CONFIDENTIAL INFORMATION FOR PERSONAL PROFIT ON THE PART OF THE SELLING DEFENDANTS

88.    Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as though fully set forth herein.

89.    The Selling Defendants at all times relevant hereto, occupied fiduciary positions with Michaels that made them privy to confidential material inside information concerning Michaels and its operations, including the wrongful practices alleged herein, senior management's knowledge thereof, and Michaels' resulting exposure to injury and liability.

90.    Notwithstanding their duty to Michaels to refrain from trading in Michaels' common stock on the basis of adverse material non-public information, these defendants directed the sale of Michaels' stock in violation of such duty and thereby profited.

91.    The Selling Defendants sold their shares of Michaels stock with knowledge of the wrongful accounting practices and adverse information concerning the Company's expected financial results and business prospects as alleged herein. At the time they made such sales, they knew they were in possession of such confidential material inside information which was not known to the general investing public.

- 39 -

I:\MichaelStores\Dutil\Complaint.doc

92.     By reason of their breaches of their fiduciary duties to Michaels not to trade on confidential material inside information, the Selling Defendants must account and are liable to Michaels for any and all profits unlawfully derived from such trades.

## COUNT III

## CONTRIBUTION AND INDEMNIFICATION

93.     Plaintiff repeats and realleges each and every allegation set forth above.

94.     Michaels is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to defendants' liability to Catalina.

95.     Michaels' alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the defendants as alleged above, and Michaels is entitled to contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against Michaels by virtue of the defendants' misconduct.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Directing the defendants to pay to the Company all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.      Requiring the defendants to return to Michaels all salaries and the value of other remuneration of whatever kind paid to them by the Company and all proceeds of all insider stock sales, during the time they were in breach of the fiduciary duties they owed to Michaels;

C.      Directing the defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of defendants' culpable conduct;

- 40 -

I:\MichaelStores\Dutil\Complaint.doc

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  September 10, 2003.

Respectfully submitted,

William B. Federman, TX Bar #00794935
Stuart W. Emmons
FEDERMAN & SHERWOOD
120 N. Robinson Avenue, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/FAX: (405) 239-2112
      – and –
2926 Maple Avenue, Suite 200
Dallas, TX 75201
**ATTORNEYS FOR PLAINTIFF**

I:\MichaelStores\Dutil\Complaint.doc

## VERIFICATION OF PLAINTIFF LEO J. DUTIL

     I verify that I am Leo J. Dutil. I further verify that I was a shareholder of Michaels Stores, Inc. at the time of the occurrences complained of in the Derivative Complaint ("Complaint"). Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true.


_____9-10-03_____         _____
Date                       Leo J. Dutil